UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COLLEGE SPORTS COUNCIL,          )
    1825 I Street, NW Suite 400     )
    Post Office Box 53356            )
    Washington, DC 20009,            )
        Plaintiff,               )
                 )          Civil Action No. _____
           v.            )
DEPARTMENT OF EDUCATION,          )
    400 Maryland Avenue, SW          )
    Washington, DC 20202,            )
        Defendant.               )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The College Sports Council ("CSC"), Plaintiff in the above-captioned action, seeks declaratory and injunctive relief based on the following allegations.

### NATURE OF THE ACTION

1.    Plaintiff brings this action to protect athletic opportunities and teams from further elimination at educational institutions that receive federal financial assistance (hereinafter, "schools") and to end various other forms of ongoing gender-conscious discrimination in athletics.  The challenged elimination and other discrimination are the direct and indirect result of the unlawful rules and policies (collectively, hereinafter "rules") that the United States Department of Education ("USDE") and its predecessor the United States Department of Health, Education and Welfare ("HEW") issued under the color of implementing Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (2000) ("Title IX").

2.    Specifically, Plaintiff CSC challenges (a) the so-called "Three-Part Test" (which HEW issued as a nonbinding statement of policy in December 1979 and USDE purported to elevate to a substantive legal requirement in January 1996 and further modified in July 2003),

and (b) related administrative actions in which USDE has directly or indirectly mandated or authorized schools to engage in gender-conscious discrimination in order to comply with the Three-Part Test.  Plaintiff alleges that the Three-Part Test and these related administrative actions constitute a regulatory disparate-impact standard and affirmative-action mandate that Congress did not authorize; that they mandate or authorize the very discrimination that Title IX prohibits; and that they violate constitutional equal-protection guarantees, Title IX's statutory prohibition against gender-based discriminations, and the applicable Title IX rules and regulations.  Plaintiff further alleges that the Three-Part Test and related administrative actions were issued without observing the statutorily required procedures, thereby rendering the Three-Part Test and related administrative actions null and void.

3.      Plaintiff seeks declaratory and injunctive relief to compel USDE to comply with the civil-rights requirements of the Constitution and Title IX and the rulemaking requirements of both Title IX and the Administrative Procedure Act, 5 U.S.C. §§ 551-706 (2000) ("APA").  As set forth more fully below, Plaintiff seeks the following declaratory and injunctive relief:

(a) a declaration that the Three-Part Test, the 1996 Clarification, and the 2003 Further Clarification substantively violate the discrimination prohibitions of Title IX and its implementing regulations, as well as the Equal Protection component of the Due Process Clause of the U.S. Constitution;

(b) a declaration that the Three-Part Test, the 1996 Clarification, and the 2003 Further Clarification violate the procedural requirements of the APA and Title IX;

(c) an order vacating USDE's Three-Part Test, the 1996 Clarification, and the 2003 Further Clarification and remanding USDE's Title IX regulations to USDE for a rulemaking consistent with this Court's substantive holdings in this action and in accordance

with a schedule set by this Court; and

(d) an order staying enforcement of all disparate-impact components of the Title IX athletics rules and regulations until the USDE completes the rulemaking ordered by this Court and the resulting final rule goes into effect pursuant to all applicable statutory procedural requirements.

## PARTIES

4.     Plaintiff CSC is a not-for-profit District of Columbia corporation headquartered in Washington, D.C.  CSC's institutional members include, without limitation, the College Swimming Coaches Association of America, the United States Track Coaches Association, the National Wrestling Coaches Association, and the College Gymnastics Association.  The individuals and institutions that are members of CSC and its member organizations (collectively, "CSC Members") include, without limitation, schools, athletic directors, coaches, student-athletes, athletic associations, fans, booster clubs, parents, save-our-sport groups, and alumni. CSC Members include student-athletes between eighteen and twenty-one years of age.

5.     CSC Members have educational, professional, economic, participatory, aesthetic, and spectator interests in intercollegiate athletics at substantially all of the postsecondary schools in the United States that offer intercollegiate (and fully funded club) opportunities in swimming, track and field, cross country, wrestling, and men's gymnastics, as well as hundreds of secondary schools.  These interests have been harmed (and continue to be harmed) by the elimination of athletic opportunities and teams that result from schools' efforts to comply with the Three-Part Test.

6.     CSC Members who are coaches and student-athletes currently on athletic teams desire to remain with those teams, rather than see them cut or capped.  CSC Members who are

student-athletes who have (or will have) athletic eligibility to participate in future years desire

that teams continue to exist (and that fully funded club teams be elevated to intercollegiate

status) in order to meet their athletic interests.  CSC Members that are fans, parents, booster

clubs, save-our-sport groups, and alumni have supported (and desire and intend to support in the

future) and have watched and followed (and desire and intend to watch and follow in the future)

men's athletic teams that either will be cut or have been cut because of the Three-Part Test.  The

Three-Part Test forces CSC Members who (or that) are coaches, athletic directors, and schools to

engage in gender-conscious discrimination, and such CSC Members desire to cease such

discrimination.

7.      Defendant USDE, headquartered in the District of Columbia, is an executive

department of the United States government.  Congress has empowered USDE to extend federal

financial assistance to educational programs and activities.

### JURISDICTION, SUBJECT MATTER JURISDICTION, AND VENUE

8.      This case arises out of USDE's violation of Sections 901 and 902 of Title IX, 20

U.S.C. §§ 1681, 1682, Section 4 of the APA, 5 U.S.C. § 553, and the Equal Protection

component of the Due Process Clause, U.S. CONST. amend. V.  Plaintiff's claims, therefore, raise

federal questions and questions of civil rights under acts of Congress, over which this Court has

jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 1361 (2000), the Acts of March 3, 1863,

12 Stat. 762, and June 25, 1936, 49 Stat. 1921 (as amended), and D.C. Code § 11-501.

9.      As set forth in paragraphs 74 to 84, CSC and CSC Members have suffered

discrimination and other injuries fairly traceable to the Three-Part Test and redressable by its

repeal.  *See also* Ex. 1 (declaration of Eric Pearson, Executive Director, College Sports Council).

10.     This action is timely because, as set forth in paragraphs 85 to 95, USDE fraudulently concealed the nature of its administrative actions and thus prevented Plaintiff and its members from asserting a claim in prior litigation involving the same parties, *National Wrestling Coaches Association et al. v. Department of Education,* 263 F.Supp.2d 82 (D.D.C. 2003), *appeal pending* No. 03-5169 (D.C. Cir.).  This action also is timely because CSC Members between the ages of eighteen and twenty-one years have a timely action against the Three-Part Test dating back to 1979, to 1996, and to all times between or since.

11.     This action is not barred by the APA's "adequate-remedy bar," 5 U.S.C. § 704, because CSC cannot sue any entity but USDE for the denial of CSC's petition to repeal the Three-Part Test (*see* Ex. 2, 3) and because CSC can only obtain the relief requested (i.e., rescission of USDE's Three-Part Test) in an action against USDE.

12.     The allegations raised herein constitute good cause to expedite this action under Fed. R. Civ. Proc. 57 and 28 U.S.C. § 1657(a) (2000).

13.     Pursuant to 28 U.S.C. § 1391(e) (2000), venue is proper in the District of Columbia, where USDE is headquartered.

### STATUTORY BACKGROUND

14.     Congress modeled Title IX on Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000d-7 (2000) ("Title VI").  Like Title VI's prohibition on racial discrimination, 42 U.S.C. § 2000d, Section 901(a) of Title IX broadly prohibits intentional (*i.e.,* purposeful) gender-based discrimination in federally funded educational programs and activities.  20 U.S.C. § 1681(a).  For purposes of Title IX, "intentional discrimination" means discriminatory actions taken *because* of a person's gender, not merely *in spite of* that person's gender.

15.     Unlike Title VI, Title IX incorporates the anti-quota provision from Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(j) (2000), into Section 901(b), which states *inter alia* that "Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area."  20 U.S.C. § 1681(b).

16.     Like Title VI's rulemaking provision, 42 U.S.C. § 2000d-1, Section 902 of Title IX authorizes and directs "each Federal department and agency . . . empowered to extend Federal financial assistance . . . to effectuate the provisions of section 1681 . . . by issuing rules, regulations, or orders of general applicability."  20 U.S.C. § 1682.  Section 902 further states that "No such rule, regulation, or order shall become effective unless and until approved by the President." *Id.*

17.     Congress patterned Section 902 on Section 602 of Title VI, 42 U.S.C. § 2000d-1, under which the President must publish his or her approval in the *Federal Register* before the rule, regulation, or order takes effect.

18.     On November 2, 1980, President James E. Carter issued Executive Order 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980), which delegated to the Attorney General the presidential authority to approve rules, regulations, and orders and to coordinate the implementation and enforcement of Title IX and other civil rights legislation.

19.     On June 3, 1981, Attorney General William French Smith delegated to the Assistant Attorney General in charge of the Department of Justice's Civil Rights Division the

implementation and enforcement authority (but not the authority to approve rules, regulations, and orders) that Executive Order 12,250 had delegated to the Attorney General.

20.     On February 11, 1984, the Supreme Court's decision in *Grove City College v. Bell,* 465 U.S. 555 (1984) (hereinafter, *Grove City*), held that Title IX extended only to the educational programs and activities that directly received federal funds.

21.     In the Civil Rights Restoration Act, Pub. L. No. 100-259, 102 Stat. 28 (1988) ("CRRA"), Congress prospectively extended the reach of Title IX to all of a school's educational programs and activities if any of the school's educational programs and activities received federal funds.

## REGULATORY BACKGROUND

### 1975 HEW Regulations

22.     On June 20, 1974, HEW issued proposed regulations implementing Title IX.  39 Fed. Reg. 22,228 (June 20, 1974).  Regarding athletics, the proposal required schools to assess student interest in athletics.  The proposed rule did not, however, require equal expenditure for each gender or for each team.

23.     On June 4, 1975, HEW issued final regulations implementing Title IX.  40 Fed. Reg. 24,128 (June 4, 1975) (*codified at* 45 C.F.R. §§ 86.1-.71).  HEW's regulations regarding athletics, 45 C.F.R. § 86.41 (2001), include a three-year phase-in period, 45 C.F.R. § 86.41(d), which expired on July 21, 1978.

24.     In the preamble to its final rule, HEW indicated that it eliminated the proposal's requirement to assess student interest because commenters misinterpreted it as a requirement to conduct an annual student poll and to offer teams based on the result of that poll.  40 Fed. Reg. at

24,134.  In eliminating that proposed requirement, however, HEW expressed its intent that

schools consider student interest when determining what sports to offer.  *Id.*

25.     The regulation requires schools to provide "equal athletic opportunity for

members of both sexes."  45 C.F.R. § 86.41(c).  The rule lists ten factors that HEW will consider

"among other factors" to determine whether equal opportunities are available.  *Id.*  The first

factor is "[w]hether the selection of sports and levels of competition effectively accommodate

the interests and abilities of both sexes."  45 C.F.R. § 86.41(c)(i).  The other nine factors include

equality of facilities, equipment, and housing, scheduling of games and practice, dining services,

travel, and per diems, publicity, tutors, and access to coaching.  *See* 45 C.F.R. § 86.41(c)(ii)-(x).

26.     Under the regulations as promulgated, "level of competition" refers to the type of

team offered (*i.e.,* intramural v. club v. intercollegiate/interscholastic varsity; local v. regional v.

national) and "selection of sports" refers to the sport offered (*e.g.,* track and field, gymnastics,

swimming).

27.     President Gerald R. Ford signed and approved the HEW regulation on May 27,

1975, which was published in the *Federal Register.*  40 Fed. Reg. at 24,137.

**1979 HEW Policy Interpretation**

28.     In the months after HEW's phase-in period expired, HEW received 93 complaints

against 62 colleges and universities and, on December 11, 1978, HEW's Office for Civil Rights

issued a proposed "policy interpretation" as a framework for resolving the complaints.  43 Fed.

Reg. 58,070, 58,071 (Dec. 11, 1978).

29.     HEW recognized that differences in athletic interests between genders could

cause participation rates to differ, even at schools that provide equal opportunity.  *See* 43 Fed.

Reg. at 58,072 ("Intercollegiate athletic programs that provide *equal opportunities* for both sexes

may offer different sports, and have *different participation rates* and varying competition opportunities for men and for women, because their interests and abilities may be different") (emphasis added).

30.     On December 11, 1979, HEW issued its policy interpretation.  44 Fed. Reg. 71,413, 71,414 (Dec. 11, 1979) ("1979 Policy Interpretation").

31.     HEW neither intended nor considered its 1979 Policy Interpretation (including the Three-Part Test) to constitute a "generally applicable rule, regulation, guideline, interpretation, or other requirement" that would bind either the agency or the public, and expressly so indicated in justifying the agency's failure to seek President Carter's signature and to submit the 1979 Policy Interpretation to Congress under the General Education Provisions Act.  *See* Ex. 4, at 8, 36-42 (incorporated herein by reference).  Exhibit 4 is a certified copy of the HEW memorandum requesting that Secretary Patricia Roberts Harris approve the 1979 Policy Interpretation.  Secretary Harris signed the 1979 Policy Interpretation based on this HEW memorandum.  The HEW memorandum is in the Secretary's papers at the Manuscripts Division of the Library of Congress.

32.     The 1979 Policy Interpretation did not go through notice-and-comment rulemaking for purposes of Section 4 of the APA, 5 U.S.C. § 553(b)-(c), and HEW eschewed any suggestion that the public comment that HEW sought on its proposed policy interpretation somehow rendered the final 1979 Policy Interpretation anything more than a nonbinding proposal on how the agency may act in the future.

33.     The 1979 Policy Interpretation states that "[t]he final Policy Interpretation does not contain a separate section on schools' future responsibilities.  However, schools remain obligated by the Title IX regulations to accommodate effectively the interests and abilities of

male and female students with regard to the selection of sports and levels of competition available." Further, in its internal justification for its 1979 Policy Interpretation, HEW expressly states that "failure to meet the [Policy Interpretation] compliance factors does not constitute proof that an educational institution violated Title IX."

34.     The 1979 Policy Interpretation was "designed specifically for intercollegiate athletics" but states that "its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by regulation." 44 Fed. Reg. 71,413.

35.     The 1979 Policy Interpretation's guidance on "equal athletic opportunity" consists of an "Overall Determination of Compliance" and three specific sections captioned: (1) determination of interests and abilities; (2) selection of sports; and (3) selection of the level of competition. 44 Fed. Reg. at 71,417-18.

36.     The "Overall Determination of Compliance" contains the following three criteria:

        (a) whether a school's policies are discriminatory in language or effect;

        (b) whether the school's program as a whole includes substantial and unjustified disparities in the opportunities or treatment afforded to male and female athletes; and

        (c) whether segments of the school's program include disparities in the treatment and opportunities that are substantial enough to deny equality of athletic opportunity.

37.     With regard to assessing interests and abilities, the 1979 Policy Interpretation allows schools to assess students' athletic interests and abilities by any non-discriminatory method, provided that:

        (a) the process takes into account the nationally increasing levels of women's interests and abilities;

        (b) the methods do not disadvantage the members of the underrepresented gender;

(c) the methods of determining ability consider team performance records; and

(d) the methods are responsive to the expressed interests of students of the underrepresented gender capable of intercollegiate competition.

38.     With regard to selecting sports, the 1979 Policy Interpretation does not require schools to integrate teams or to field male and female teams in all sports.  Under the 1979 Policy Interpretation, however, if a school excludes a gender from a contact sport, it must also field a team for the excluded gender if opportunities have historically been limited and there is sufficient interest to support a viable team with a reasonable expectation of intercollegiate competition.  For a non-contact sport, the school must field a team for the excluded gender if that gender has insufficient skill to compete on an integrated team, opportunities have historically been limited for that gender, and there is sufficient interest to support a viable team with a reasonable expectation of intercollegiate competition.

39.     The 1979 Policy Interpretation does not require schools to upgrade teams to intercollegiate status absent a "reasonable expectation" that intercollegiate competition will be available in the school's normal competitive region.  When opportunities for a gender have historically been limited, however, the 1979 Policy Interpretation may require the school to encourage development of competition in the region.

40.     As signaled in the text of the 1979 Policy Interpretation, 44 Fed. Reg. at 71,417, HEW used its "other factor" authority to create a new (quantitative) factor that it describes as "equal competitive opportunity" in its internal memorandum, Ex. 4, at 16, and as "levels of competition including the opportunity for team competition" in the 1979 Policy Interpretation, 44 Fed. Reg. at 71,417.

41.     As an application of HEW's policy to consider this new factor, the 1979 Policy

Interpretation sets forth a three-part test to assess compliance with this level-of-competition

component of "equal athletic opportunity":

(a) whether the school provides intercollegiate "participation opportunities" in

numbers substantially proportionate to enrollment;

(b) if not, whether the school can show a continuing history of expansion that is

demonstrably responsive to the developing interest of the underrepresented gender; and

(c) if not, whether the school can show that the interests and abilities of the

underrepresented gender are "fully and effectively accommodated."

This component of the 1979 Policy Interpretation is known as the "Three-Part Test."  As a mere

application of a tentative policy adopted under HEW's discretionary "other factors" authority,

the Three-Part Test is not itself a "general principle" of the 1979 Policy Interpretation.

42.     No President (before November 2, 1980) or Attorney General (after November 2,

1980) has approved the 1979 Policy Interpretation pursuant to 20 U.S.C. § 1682 and Executive

Order 12,250.  *See* paragraphs 17-19, *supra.*

**Formation of USDE and the 1980 USDE Regulations**

43.     The Department of Education Organization Act of 1979, Pub. L. No. 96-88, 93

Stat. 668 (Oct. 17, 1979), created USDE from certain educational components of HEW, with the

remaining components of HEW renamed the Department of Health & Human Services ("HHS").

20 U.S.C. § 3508(b) (2000).

44.     After the creation of USDE as a separate agency, USDE promulgated the

education-related regulations previously issued by HEW and other agencies as the Education

title of the *Code of Federal Regulations.*  45 Fed. Reg. 3082 (May 9, 1980).  HHS, the non-

USDE remnant of the former HEW, retained its own Title IX regulations.  *See* 45 C.F.R. § 86.1-.71.  USDE's Title IX regulations mirror the HEW/HHS regulations, with the names of the relevant offices and departments changed (*e.g.,* replacing HEW with USDE).

45.     No President (before November 2, 1980) or Attorney General (after November 2, 1980) has approved the 1980 USDE regulations pursuant to 20 U.S.C. § 1682 and Executive Order 12,250.  *See* paragraphs 17-19, *supra.*

46.     USDE prepared enforcement manuals in 1980 and 1990, but neither published them in the *Federal Register* nor sought or received approval from the Office of the Federal Register to incorporate them by reference in the *Federal Register.*

47.     No President (before November 2, 1980) or Attorney General (after November 2, 1980) has approved the 1980 or 1990 enforcement manuals pursuant to 20 U.S.C. § 1682 and Executive Order 12,250.  *See* paragraphs 17-19, *supra.*

**1996 USDE Clarification**

48.     On May 9, 1995, the House Subcommittee on Postsecondary Education, Training and Life-long Learning of the Economic and Educational Opportunities Committee held a hearing on Title IX and the Three-Part Test.

49.     On June 7, 1995, 142 Members of Congress wrote the Assistant Secretary of Civil Rights expressing wide agreement in Congress that USDE's Office for Civil Rights needed to issue a revised policy interpretation because, contrary to the legislative intent behind Title IX, the Three-Part Test was causing schools to eliminate men's athletic opportunities to achieve proportionality, without corresponding increases in women's athletic opportunities.

50.     On September 20, 1995, USDE issued a memorandum proposing to clarify the 1979 Policy Interpretation.  "Clarification of Intercollegiate Athletics Policy Guidance: the

Three-Part Test" (Sept. 20, 1995) (*transmitted by* Letter from Norma V. Cantú, Assistant Secretary, Office for Civil Rights, Department of Education (Sept. 20, 1995)).

51.     On October 2, 1995, USDE published a notice in the *Federal Register* announcing the availability of the draft clarification (without publishing it) and soliciting "public comment on whether the draft Clarification provides adequate clarity in areas that have generated questions."  60 Fed. Reg. 51,460 (Oct. 2, 1995).

52.     By letter dated October 20, 1995 (Ex. 5), a CSC Member (the National Wrestling Coaches Association) advised USDE that the Three-Part Test violated Title IX and the Constitution and failed to address changed circumstances between the 1970s and the 1990s.

53.     On January 16, 1996, the USDE issued its "Clarification of Intercollegiate Athletics Policy Guidance: the Three-Part Test" (Jan. 16, 1996) (*transmitted by* Letter from Norma V. Cantú, Assistant Secretary, Office for Civil Rights, Department of Education (Jan. 16, 1996)) ("1996 Clarification").  In the USDE press release announcing the 1996 Clarification (Ex. 6), USDE characterized the 1996 Clarification as identifying "legal obligations."

54.     In the 1996 Clarification, USDE acknowledged receipt of comments suggesting that the 1979 Policy Interpretation "provided more protection for women's sports than intended by Title IX" but dismissed those comments because "it would not be appropriate to revise the 1979 Policy Interpretation."

55.     The 1996 Clarification asserts that the proportionality prong of the Three-Part Test is a "safe harbor" for complying with the equal opportunity provisions of the regulations, but that schools are free to choose to comply with the other two tests.

56.     In the 1996 Clarification, USDE stated that it will count athletes – not unfilled spots on teams – when it assesses the proportionality of participation opportunities: "OCR [*i.e.,*

the Office for Civil Rights] must, however, count actual athletes because participation opportunities must be real, not illusory."

57.     The 1996 Clarification announces USDE's position on capping: "The rules here are straightforward.  An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test."  ("Capping" means placing an artificially low limit on the number of participants on a team to achieve gender proportionality across teams.)

58.     The 1996 Clarification was USDE's first public announcement that USDE had extended the Three-Part Test to interscholastic athletic programs.

59.     The 1996 Clarification was USDE's first post-*Grove City* public announcement that the Three-Part Test applied to athletic departments that do not directly receive federal funds.

60.     The third prong of the Three-Part Test described in the 1996 Clarification differs from that described in USDE's 1980 Title IX Intercollegiate Athletics Investigator's Manual. Specifically, in 1980, USDE interpreted prong three to mean that a school must accommodates the underrepresented gender's interest "to the same degree that it accommodates the interests . . . of the other gender."  During the 1980s, USDE interpreted and enforced prong three consistently with its 1980 manual, under a comparative analysis that included whether a college offered intercollegiate sports for men and women in the same proportion to the interscholastic sports offered to boys and girls.  In the 1996 Clarification, USDE changed the inquiry of prong three to whether the underrepresented gender has "(a) unmet interest in a particular sport; (b) sufficient ability to sustain a team in the sport; and (c) a reasonable expectation of competition for the team."

61.     USDE neither published the 1996 Clarification in the *Federal Register* nor sought or received approval from the Office of the Federal Register to incorporate the 1996 Clarification (or the September 20, 1995 draft clarification) by reference in the *Federal Register.*

62.     In the 1995-96 Clarification process, USDE did not follow any procedure that USDE previously had published in the *Federal Register* pursuant to 5 U.S.C. § 552(a)(1)(C).

63.     No President or Attorney General has approved the 1996 Clarification pursuant to 20 U.S.C. § 1682 and Executive Order 12,250.  *See* paragraphs 17-19, *supra.*

**2003 Further Clarification and Petition Denial**

64.     On January 10, 2003, CSC filed a petition to repeal the Three-Part Test, attached hereto as Exhibit 2 and incorporated herein by reference.

65.     On July 11, 2003, USDE issued a further clarification of the Three-Part Test. "Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance" (July 11, 2003) ("2003 Further Clarification").

66.     In its 2003 Further Clarification, USDE *inter alia* claims that the 1979 Policy Interpretation "established a three-prong test for compliance with Title IX, which [USDE] later amplified and clarified in its 1996 Clarification" and elevates the Three-Part Test's second and third prongs to safe-harbor status, parallel with the 1996 Clarification's elevation of the Three-Part Test's first prong.

67.     In its 2003 Further Clarification, USDE "advises schools that it will aggressively enforce Title IX standards, including implementing sanctions for institutions that do not comply."

68.     USDE did not issue its 2003 Further Clarification pursuant to any procedure that USDE previously had published in the *Federal Register* pursuant to 5 U.S.C. § 552(a)(1)(C).

69.     No President or Attorney General has approved the 2003 Further Clarification pursuant to 20 U.S.C. § 1682 and Executive Order 12,250.  *See* paragraphs 17-19, *supra.*

70.     By letter dated July 28, 2003 (attached hereto as Exhibit 3), USDE advised CSC that USDE had denied CSC's petition.

**Status of 1979 Policy Interpretation (and Three-Part Test) as Nonbinding Policy Statement**

71.     With regard to athletic scholarships, the 1979 Policy Interpretation indicates that, when schools provide athletic scholarships, the total amount of scholarship aid by gender must be substantially proportional to the genders' participation rates in intercollegiate athletics. USDE's 1980 enforcement manual (page 29) provides that "'substantially proportional' is not a fixed number or percent," but notes that a two-percent gap between participation and scholarships is substantially proportional, whereas a fifteen-percent gap is not.  USDE's 1990 enforcement manual (page 19) directs inspectors to use a 95% confidence interval to evaluate whether a six-percent gap is substantially proportional.  USDE's July 23, 1998 "Dear Colleague" letter indicates that a one-percent gap creates a "strong presumption" of noncompliance.  In summary, for more than fifteen years, a two-percent gap and (in most cases) a six-percent gap were "substantially proportional," and thus complied with Title IX, until USDE suddenly determined (by memorandum) that they presumptively violated Title IX.

72.     With regard to athletic recruiting and support services, the 1979 Policy Interpretation acknowledges adding these factors to its regulatory list under the agency's regulatory authority to consider "other factors" beyond the regulatory list.  44 Fed. Reg. at 71,415.

73.     Although not the subject of this litigation, the foregoing paragraphs 71 through 72 establish for additional provisions of USDE's Title IX regime the same conclusion that paragraphs 40, 55 through 60, and 66 establish for the Three-Part Test: USDE has changed its Title IX regime at will, without following procedural requirements of Title IX or the APA.

**Effects from the Enforcement of the Three-Part Test**

74.     In high schools, boys and girls constitute approximately 58 and 42 percent, respectively, of interscholastic athletes.  In college (based only on data from schools in the National Collegiate Athletic Association), men and women constitute approximately 58 and 42 percent, respectively, of intercollegiate athletes.  In high school, boys and girls each constitute approximately half of the students.  In college, men and women constitute approximately 45 and 55 percent, respectively, of full-time undergraduate students.

75.     USDE has conducted the inspection, enforcement, and oversight of intercollegiate and interscholastic athletics using the 1979 Three-Part Test, as revised by the 1996 Clarification and 2003 Further Clarification.

76.     USDE has initiated investigations at schools where athletic participation rates did not match enrollment rates by gender, but where no student had alleged discrimination.

77.     Pursuant to the Three-Part Test, as revised by the 1996 Clarification and 2003 Further Clarification, USDE has negotiated and monitored compliance agreements with schools. As a result of such actions, the schools reduced male participation opportunities through gender-conscious cutting and capping of men's athletic opportunities.

78.     USDE's Three-Part Test directly and indirectly has reduced (and continues to limit and to reduce) participation opportunities for male athletes.

79.    Seeking to avoid USDE enforcement actions, schools have limited male participation opportunities to comply with USDE's Three-Part Test.  As a direct and indirect result of USDE's Three-Part Test, schools (including schools that are CSC Members and those that are the actual or prospective employer or *alma mater* of individual CSC Members) have cut hundreds of men's teams and have capped hundreds of men's participation opportunities.

80.    As the direct and indirect result of USDE's Three-Part Test, under the euphemism "roster management," CSC Members have been forced to serve (and continue to be forced to serve) as the involuntary participants who implement USDE's Three-Part Test by capping athletes solely to achieve the quota established pursuant to the Three-Part Test.

81.    Schools, athletic directors, and coaches that are CSC members must engage in intentional discrimination (gender-conscious cutting and capping) in violation of Title IX in order to comply with USDE's Three-Part Test and with USDE-negotiated settlements.  Because they cannot sue themselves, they cannot obtain an adequate remedy in any other challenge to USDE's Title IX rules.  Capping is widely prevalent in intercollegiate athletics.  *See* "Want to Try Out for College Sports? Forget It," *New York Times,* A1 (Sept. 22, 2002) (Ex. 7), incorporated herein by reference.

82.    The injunctive and declaratory relief requested in paragraph 140, *infra,* will redress the injuries alleged herein by eliminating USDE's Three-Part Test and the safe-harbor provisions of the 1996 Clarification and 2003 Further Clarification, thereby restoring the statute's protections against intentional gender-conscious discrimination, 20 U.S.C. § 1681, and the regulations' requirement that schools provide equal opportunity (not equal participation) based on interest and abilities (not enrollment).  45 C.F.R. § 86.41(c)(i).  The injunctive and

declaratory relief is necessary to restore the rights of men and women to an equal footing in the allocation of athletic opportunities.

83.     Enforcement actions brought against schools do not provide an adequate remedy for student-athletes because schools typically announce cutting and capping decisions in the spring after the deadline for applying to transfer.  Cutting and capping decisions often come after the schools that still may accept transferees for the next year have allocated their scholarships. As a result, when a school makes a cut or announces capping, student-athletes do not have an opportunity to seek other opportunities.

84.     Declaratory relief is inadequate to remedy the injuries to CSC Members because USDE's Three-Part Test, as revised by the 1996 Clarification and 2003 Further Clarification, serves as a substantial factor motivating schools' decisions to cut or cap men's athletic opportunities.  Failure to meet USDE's proffered definition of "equal" tarnishes the school's reputation, notwithstanding that a school in fact may comply with the regulatory standard (equal opportunity, based on interest).  As long as it remains extant as an influential document of the agency responsible for much of schools' federal funding, therefore, the Three-Part Test will remain a substantial factor in schools' decisions on what athletic opportunities to provide.

## TIMELINESS OF ACTION AGAINST THREE-PART TEST

85.     An agency "re-opens" a prior action to challenge when it changes its interpretation of that prior action.  An agency "constructively re-opens" an administrative action previously closed to judicial review when a subsequent action "changes the stakes" of the earlier action.  Further, agencies have an "everpresent duty to insure that their actions are lawful."

86.     In the 1979 Policy Interpretation, by its terms, the Three-Part Test was a tentative, nonbinding *application* of a tentative, nonbinding *policy* to consider intercollegiate participation

opportunities as an "other factor" in future HEW adjudications of administrative complaints pending more than twenty years ago. The 1996 Clarification purports to elevate the Three-Part Test to a legal obligation for all prospective Title IX compliance, thereby reopening the Three-Part Test for judicial review.

87. USDE's 1996 Clarification declares that the Three-Part Test's first prong (proportionality) provides a "safe harbor," under which schools lawfully may cut or cap men's teams to achieve gender proportionality with enrollment rates. By authorizing schools to use the Three-Part Test's first prong as a "safe harbor" for Title IX compliance, even to the point of violating the anti-discrimination and equal-opportunity provisions of the Overall Determination of Compliance, the Constitution, Title IX, and the implementing Title IX regulations, USDE's 1996 Clarification reopened the 1979 Policy Interpretation to judicial review by revealing an aspect of the Three-Part Test that was unforeseeable (or simply not present) in 1979.

88. Although the Three-Part Test in the 1979 Policy Interpretation refers to "participation opportunities," USDE's 1996 Clarification declares that schools must compare the gender ratio of "participants" when seeking to demonstrate gender proportionality under the Three-Part Test. Accordingly, USDE's 1996 Clarification revealed an aspect of the Three-Part Test that was unforeseeable in 1979, thereby reopening the 1979 Policy Interpretation to judicial review.

89. Although the Three-Part Test in the 1979 Policy Interpretation did not apply by its terms to interscholastic athletic programs and neither the 1995 draft clarification nor the final 1996 Clarification published any data or made any findings that discrimination even exists at the interscholastic level, the 1996 Clarification extends the scope of the Three-Part Test to interscholastic athletics. Accordingly, USDE's 1996 Clarification revealed an aspect of the

Three-Part Test that was unforeseeable in 1979, thereby reopening the 1979 Policy Interpretation to judicial review.

90.     Although USDE previously memorialized and followed an interpretation of the Three-Part Test's third prong (fully accommodating the interests of the underrepresented gender) that required accommodating the underrepresented gender's interest to the same extent as the school accommodated the other gender's interest, the 1996 Clarification changed the analysis to one based solely on the accommodation of the interests of the underrepresented gender, without regard for the degree of accommodation of the other gender.  Accordingly, USDE's 1996 Clarification changed the interpretation of an aspect of the Three-Part Test, thereby reopening the 1979 Policy Interpretation to judicial review.

91.     USDE's 2003 Further Clarification declares that the Three-Part Test's second and third prongs also provide a "safe harbor," which would allow a school to eliminate any part of its men's athletic program, provided that the school shows progress to meeting the interests of the underrepresented gender or fully accommodates the underrepresented gender.  By authorizing schools to do so, USDE's 2003 Further Clarification reopened the 1979 Policy Interpretation to judicial review by revealing an aspect of the Three-Part Test that was unforeseeable (or simply not present) in 1979.

92.     Under the APA, USDE had an obligation to publish a proposed rule that described the subjects and issues involved.  Although USDE published a *Federal Register* notice announcing the availability of the draft clarification, that notice did not indicate that USDE intended to elevate a nonbinding, tentative policy into a substantive legal requirement.

93.     In the prior litigation of this matter, USDE affirmatively misrepresented the procedural history and legal status of its 1979 Policy Interpretation.  Similarly, USDE has

affirmatively misrepresented the procedural history and legal status of the 1979 Policy

Interpretation in testimony to Congress and elsewhere, public statements, *amicus curiae* briefs

(with the Department of Justice), and on its internet site.

94.     Litigants and panels in eight other U.S. courts of appeal have reviewed the Three-

Part Test without either discussing the APA rulemaking argument or locating the HEW

memorandum that CSC attaches hereto (Ex. 4).  CSC located the document on October 7, 2003,

requested a certified copy on October 10, 2003, and obtained the certified copy on October 27,

2003.

95.     CSC Members born within six years of HEW's issuing the 1979 Policy

Interpretation have a cause of action against the Three-Part Test.  CSC Members who were

minors at the time of any subsequent actions related to the Three-Part Test  have a cause of

action against such subsequent actions.  Such causes of action are timely filed within three years

of the date when such CSC Members attain the age or majority.

**COUNT I**
**USDE'S TITLE IX RULES UNLAWFULLY ESTABLISH A DISPARATE-IMPACT**
**STANDARD AND UNLAWFULLY AUTHORIZE INTENTIONAL DISCRIMINATION**

96.     Plaintiff incorporates paragraphs 1 through 95 as if fully set forth herein.

97.     Title IX prohibits only intentional gender-based discrimination.

98.     As a federal department empowered to extend federal financial assistance to

educational programs and activities, USDE has a nondiscretionary duty to promulgate rules to

effectuate Title IX's prohibition of intentional gender discrimination.  20 U.S.C. § 1682.

99.     Title IX does not authorize USDE to create (by rule) a generally applicable

disparate-impact standard or affirmative-action requirement.

100.    The Three-Part Test violates Title IX, the implementing regulations, the Equal Protection component of the Due Process Clause, and the Equal Protection Clause of the 14th Amendment by requiring those schools where men are more interested than women in athletics to discriminate against male student-athletes in one or more of the following ways:

(a) allocate athletic opportunities based on enrollment, which provides men with fewer athletic opportunities than it provides to women, vis-à-vis the genders' respective athletic interest;

(b) continually expand athletic opportunities for women far beyond the level of opportunities provided to men, vis-à-vis the genders' respective athletic interest; and/or

(c) "fully" accommodate the athletic interests of women notwithstanding that the school does not also fully accommodate the athletic interests of men.

101.    Title IX does not authorize USDE to issue a rule authorizing schools to engage in intentional gender discrimination – such as gender-conscious cutting or capping – to achieve compliance with a generally applicable disparate-impact standard or affirmative-action requirement.

102.    USDE failed to identify any "important government objective" served by gender-conscious cutting and capping to bring athletic participation into proportion with enrollment rates.

103.    Capping a male athlete off a team or cutting an entire men's team because not enough female students elect to participate in the available participation opportunities violates the Equal Protection Clause of the Fourteenth Amendment, Title IX, Title IX's implementing regulations, and the Overall Determination of Compliance.

104.    USDE's authorizing such capping and cutting violates the Equal Protection

component of the Due Process Clause, Title IX, Title IX's implementing regulations, and the

Overall Determination of Compliance.

105.    For the foregoing reasons, the Three-Part Test, 1996 Clarification's authorization

of gender-conscious cutting and capping, and the safe-harbor provisions of the 1996

Clarification and 2003 Further Clarification violate Title IX, the implementing regulations, and

the U.S. Constitution.


## COUNT II
## THE "THREE-PART TEST" UNLAWFULLY BASES COMPLIANCE ON
## ENROLLMENT RATHER THAN ATHLETIC INTEREST

106.    Plaintiff incorporates paragraphs 1 through 95 and paragraphs 96 through 105 as

if fully set forth herein.

107.    Notwithstanding that Title IX incorporates anti-quota language in 20 U.S.C.

§ 1681(b), and that the Title IX regulations require schools to assess students' athletic interests

"by a reasonable method [the school] deems appropriate" and to provide equal athletic

opportunity, USDE's Three-Part Test uses (and requires the use of) enrollment as the measure of

student interest.

108.    When otherwise allowed by law, a disparate-impact analysis requires comparison

with the qualified applicant pool, not the general population.  Assuming for the sake of argument

that USDE has authority to establish a regulatory disparate-impact standard, USDE must assess

such impacts by comparing athletic opportunities to the students actually interested in

participating in athletics, not to all enrolled students.

109.    For the foregoing reasons, the Three-Part Test, the 1996 Clarification, and the 2003 Further Clarification violate Title IX, the implementing regulations, and the U.S. Constitution.

## COUNT III
## USDE UNLAWFULLY DENIED PETITION TO REPEAL THE "THREE-PART TEST"

110.    Plaintiff incorporates paragraphs 1 through 95, paragraphs 96 through 105, and paragraphs 106 through 109 as if fully set forth herein.

111.    The APA authorizes any interested person to petition an agency to adopt, amend, or repeal a rule.  5 U.S.C. § 553(e).

112.    On January 10, 2003, Plaintiff CSC petitioned USDE to repeal the Three-Part Test and related agency actions.

113.    For the reasons set forth in CSC's petition, the Three-Part Test exceeds USDE's authority and violates constitutional, statutory, and regulatory provisions prohibiting gender-conscious discrimination and requiring equal opportunity.

114.    As reinterpreted by USDE, the Three-Part Test is an affirmative-action mandate designed to remedy perceived discrimination in postsecondary education, all premised on incomplete data from intercollegiate athletics programs circa 1978.

115.    Even when authorized by Congress, such affirmative-action plans can last no longer than the specific discrimination they are designed to remedy, and regulatory affirmative-action mandates require evidence of discrimination.

116.    By letter dated July 28, 2003, USDE notified CSC that USDE denied CSC's Petition.  In denying the petition, USDE not only exceeded its legal authority, but also did so without any evidence of discrimination to justify USDE's continuing the Three-Part Test, even if it had the legal authority to do so.

117.    For the foregoing reasons, by expressly denying a petition to amend or repeal the Three-Part Test and related agency actions, USDE's denial constitutes final agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

**COUNT IV**
**USDE'S 1996 CLARIFICATION UNLAWFULLY SIDESTEPPED QUESTIONS ON**
**USDE'S LEGAL AUTHORITY FOR THE THREE-PART TEST AND THE WISDOM**
**OF THE THREE-PART TEST AS A MEASURE FOR TITLE IX COMPLIANCE**

118.    Plaintiff incorporates paragraphs 1 through 95, paragraphs 96 through 105, paragraphs 106 through 109, and paragraphs 110 through 117 as if fully set forth herein.

119.    USDE's 1996 Clarification acknowledges that many commenters requested USDE to amend or repeal the Three-Part Test because the Three-Part Test exceeds the intent of Title IX.  In addition, a CSC Member advised USDE that the Three-Part Test violates the Constitution and should be repealed or amended to reflect changed circumstances between the 1970s and 1990s.

120.    In the 1996 Clarification, USDE justified its decision to summarily ignore these comments by noting that "it would not be appropriate to revise the 1979 Policy Interpretation." In its 1996 Clarification, however, USDE profoundly revised the 1979 Policy Interpretation, to the point of requiring notice-and-comment rulemaking.  As such, USDE had no authority to evade or avoid questions about its legal authority or the continued wisdom of the Three-Part Test.

121.    For the foregoing reasons, USDE's 1996 Clarification is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

## COUNT V
### THE THREE-PART TEST, 1996 CLARIFICATION, AND 2003 FURTHER CLARIFICATION ARE NOT IN EFFECT

122.    Plaintiff incorporates paragraphs 1 through 95, paragraphs 96 through 105, paragraphs 106 through 109, paragraphs 110 through 117, and paragraphs 118 through 121 as if fully set forth herein.

123.    Under 20 U.S.C. § 1682 and Executive Order 12,250, no rule, regulation, or order of general applicability issued by a federal agency under Title IX takes effect until approved by either the President (before November 2, 1980) or the Attorney General (after November 2, 1980) and such approval is published in the *Federal Register.*

124.    No President or Attorney General has approved the 1979 Policy Interpretation, the USDE's implementing regulations, 34 C.F.R. § 106.1-.71, the 1996 Clarification, or the 2003 Further Clarification pursuant to 20 U.S.C. § 1682 and Executive Order 12,250.

125.    For the foregoing reasons, the 1979 Policy Interpretation, the 1996 Clarification, and the 2003 Further Clarification have no force or effect.

## COUNT VI
### THE 1996 CLARIFICATION VIOLATED THE APA'S NOTICE-AND-COMMENT RULEMAKING REQUIREMENTS

126.    Plaintiff incorporates paragraphs 1 through 95, paragraphs 96 through 105, paragraphs 106 through 109, paragraphs 110 through 117, paragraphs 118 through121, and paragraphs 122 through 125 as if fully set forth herein.

127.   Before an agency lawfully can issue a substantive rule, the APA requires the agency to publish a notice of proposed rulemaking in the *Federal Register* and to provide an opportunity to comment.  5 U.S.C. § 553(b)-(c).

128.   The APA exempts "interpretative rules, general statements of policy, or rules of agency . . . practice" from the notice-and-comment rulemaking requirement.  5 U.S.C. § 553(b)(A).

129.   The APA requires a new notice-and-comment rulemaking to add specific new regulatory factors to an existing substantive rule's enumeration of regulatory factors, notwithstanding that the existing substantive rule allows the agency to consider "other factors" on a case-by-case basis.

130.   When an administrative action (a) creates the basis either for enforcement action or for agency action to confer benefits, or (b) effectively amends a prior substantive rule or regulatory interpretation, the administrative action constitutes a substantive rule and thus requires notice-and-comment rulemaking.

131.   As set forth in paragraph 86, *supra,* by its original terms, the Three-Part Test did not apply prospectively to schools' future compliance, but instead served only as HEW's nonbinding proposed framework for resolving the nearly 100 administrative complaints pending in 1979.  By elevating the 1979 Three-Part Test to a "legal obligation" for Title IX compliance in 1996 (and prospectively thereafter), USDE amended the 1979 Policy Interpretation and the implementing Title IX regulations, without the APA-required rulemaking.[1]

---

[1]   In the event that the original Three-Part Test was (or became) binding on the agency or the public, the original Three-Part Test would violate the APA's rulemaking requirements for the same reasons that Plaintiff alleges that the 1996 Clarification violates those requirements.

132.    The 1979 Policy Interpretation's Three-Part Test asks, in part, whether a school provides intercollegiate "participation opportunities" in numbers substantially proportionate to enrollment.  In the 1996 Clarification, USDE amended the 1979 Policy Interpretation from counting available "participation opportunities" (*i.e., spots* on a team) to counting "participants" (*i.e., athletes* on a team) when determining whether a school complies with the gender-proportionality prong of the Three-Part Test.

133.    By its terms, the 1979 Three-Part Test did not apply at all to interscholastic athletic programs.  In the 1996 Clarification, USDE amended the Three-Part Test to apply at least somewhat to interscholastic athletics.

134.    In USDE's 1980 enforcement manual (Title IX Intercollegiate Athletics Investigator's Manual), the third prong of the Three-Part Test (fully accommodating the interests of the underrepresented gender) required schools to assess whether they accommodated the underrepresented gender's interest to the same extent as they accommodated the other gender's interest.  In the 1996 Clarification, USDE amended the third prong of the Three-Part Test to refer only to whether the interests of the underrepresented gender were fully accommodated, with no regard for whether the interests of the other gender also were fully accommodated.

135.    The 1996 Clarification purports to authorize gender-conscious discrimination, notwithstanding the prohibitions and protections of the Overall Determination of Compliance, Title IX, the Title IX regulations, the Due Process Clause's Equal Protection component, and the Equal Protection Clause of the 14th Amendment.  In that process, the 1996 Clarification amends the regulatory prohibition against discrimination, without the APA-required rulemaking.

136.    For the foregoing reasons, the 1996 Clarification is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the law and was issued without observance of procedure required by law.

## COUNT VII
## THE 2003 FURTHER CLARIFICATION VIOLATED THE APA'S NOTICE-AND-COMMENT RULEMAKING REQUIREMENTS

137.    Plaintiff incorporates paragraphs 1 through 95, paragraphs 96 through 105, paragraphs 106 through 109, paragraphs 110 through 117, paragraphs 118 through 121, paragraphs 122 through 125, and paragraphs 126 through 136 as if fully set forth herein.

138.    The 2003 Further Clarification purports to elevate the Three-Part Test's second and third prongs to safe harbors and to establish that compliance with those provisions will excuse gender-conscious cuts and caps that otherwise would violate Title IX, the Title IX regulations, the Overall Determination of Compliance, the Equal Protection Component of the Due Process Clause, and the Equal Protection Clause of the 14th Amendment.  In that process, the 1996 Clarification amends the regulatory prohibition against discrimination, without the APA-required rulemaking.

139.    For the foregoing reasons, USDE's 2003 Further Clarification is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the law and was issued without observance of procedure required by law.

## PRAYER FOR RELIEF

140.    WHEREFORE, Plaintiff CSC respectfully requests that this Court enter the following relief:

A.      Pursuant to 5 U.S.C. § 706(2), 28 U.S.C. §§ 1331, 1343(a)(4), 1361, 1651(a), 2201-2202, the Acts of March 3, 1863, 12 Stat. 762, and June 25, 1936, 49 Stat. 1921 (as amended), D.C. Code § 11-501, Fed. R. Civ. Proc. 57, and the court's equitable powers, a Declaratory Judgment that:

(i)      Title IX and the Equal Protection component of the Due Process Clause authorize only rules that effectuate Title IX's prohibition of intentional discrimination and do not authorize rules that create a disparate-impact standard or affirmative-action mandate;

(ii)     Title IX and the Equal Protection component of the Due Process Clause prohibit USDE from requiring or authorizing schools to engage in gender-conscious cutting or capping solely to meet a disparate-impact standard or affirmative-action mandate;

(iii)    To the extent that schools may make gender-conscious decisions regarding athletic opportunities, Title IX, the Title IX regulations, the Equal Protection component of the Due Process Clause, and the Equal Protection Clause of the 14th Amendment require schools to use athletic interest and ability – not enrollment – as the relevant population;

(iv)     Under Title IX, the Title IX regulations, the Equal Protection component of the Due Process Clause, and the Equal Protection Clause of the 14th Amendment, the relevant unit of "athletic opportunity" is a spot on a team, not an athlete on a team;

(v)      In 2003, UDSE unlawfully denied CSC's petition to repeal USDE's Three-Part Test;

(vi)     In 1996, USDE unlawfully declined to address issues raised by a CSC Member (the National Wrestling Coaches Association) and others regarding (a) USDE's lack of legal authority for the Three-Part Test, and (b) the irrationality of continued adherence to the Three-Part Test in light of changed circumstances and unintended consequences;

(vii)    Pursuant to 20 U.S.C. § 1682, the 1979 Policy Interpretation, the 1996 Clarification, and the 2003 Further Clarification have no force or effect;

(viii)   The 1996 Clarification's elevation of the Three-Part Test to a legal obligation purported to amend the substantive Title IX regulations in violation of the APA's rulemaking requirements, thus rendering the 1996 Clarification null and void;

(ix)     The 2003 Further Clarification's elevation of prongs two and three to safe-harbor status purported to amend the substantive Title IX regulations in violation of the APA's rulemaking requirements, thus rendering the 2003 Further Clarification null and void; and

(x)      In the Three-Part Test, 1996 Clarification, and 2003 Further Clarification, USDE acted *ultra vires* under both Title IX and the APA by consciously and expressly adopting a general policy that abdicates the statutory duty to issue rules, regulations, and orders to effectuate Title IX's prohibition of intentional gender discrimination without following APA-mandated procedures.

B.    Pursuant to 5 U.S.C. § 706(2), 28 U.S.C. §§ 1331, 1343(a)(4), 1361, 1651(a), 2202, the Acts of March 3, 1863, 12 Stat. 762, and June 25, 1936, 49 Stat. 1921 (as amended), D.C. Code § 11-501, and the court's equitable powers, an Order providing that

(i)     The Three-Part Test is vacated as arbitrary, capricious, an abuse of discretion, not otherwise in accordance with the law, in excess of the authority provided to USDE by Congress, and promulgated without observing the procedures required by law;

(ii)    USDE's 1996 Clarification and 2003 Further Clarification are vacated in their entirety as arbitrary, capricious, an abuse of discretion, not otherwise in accordance with the law, in excess of the authority provided to USDE by Congress, and promulgated without observing the procedures required by law;

(iii)   USDE's Title IX rules on athletics are remanded to USDE with instructions that – in accordance with a schedule set by this Court – USDE commence notice-and-comment rulemaking to amend those rules consistent with Title IX, the U.S. Constitution, and this Court's declaratory relief in this action;

(iv)    This Court shall retain jurisdiction over this matter until such rules are lawfully promulgated pursuant to the APA and become effective pursuant to 20 U.S.C. § 1682; and

(v)     Enforcement of USDE's disparate-impact rules for athletics is stayed until USDE promulgates a final rule pursuant to this Court's order and until such rules become effective pursuant to all procedural requirements imposed by statute.

C.      Pursuant to 42 U.S.C. § 1988(b) (2000) and 28 U.S.C. § 2412 (2000), award Plaintiff its costs, including attorneys fees.

D.      Such other relief as may be just and proper.

D.      Such other relief as may be just and proper.

Dated:  December 19, 2003                    Respectfully submitted,


                                             Lawrence J. Joseph, D.C. Bar No. 464777

                                             LAWRENCE J. JOSEPH, LLC
                                             7918 Jones Branch Drive, Suite 600
                                             McLean, VA 22102
                                             Telephone:  (202) 669-5135
                                             Telecopier:  (202) 318-2254

                                             Counsel for College Sports Council